**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF PUERTO RICO**

| | |
|---|---|
| HN1 THERAPY NETWORK OF PUERTO RICO, LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>ASOCIACIÓN PUERTORRIQUEÑA DE FISIOTERAPIA, INC., REGINA RIVERA CARDE, RAPHAEL MELÉNDEZ PÉREZ, ONEIDA RODRÍGUEZ CARABALLO, AND PEDRO PIÑERO<br><br>   Defendants, | CIVIL NO. 3:10-cv-1404<br><br>RE:   UNREASONABLE RESTRAINT OF TRADE; GROUP BOYCOTT; PRICE-FIXING; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; PRELIMINARY AND PERMANENT INJUNCTION.<br><br>PLAINTIFFS DEMAND TRIAL BY JURY |

**ACLARATORY MOTION AND PARTIAL RECONSIDERATION OF ORDER RE: DEFAULT JUDGMENT GRANTING PERMANENT INJUNCTION AGAINST ASOCIACIÓN PUERTORRIQUEÑA DE FISIOTERIAPIA, INC.**

TO THE HONORABLE COURT:

COMES NOW Plaintiff, HN1 Therapy Network of Puerto Rico, LLC d/b/a Therapy Network of Puerto Rico ("TNPR"), through undersigned counsel, and very respectfully alleges and prays as follows:

**I. Introduction**

As this Honorable Court knows, yesterday, TNPR filed a "Motion For Partial Default Judgment Against Asociación Puertorriqueña De Fisioteriapia, Inc." pursuant to Federal Rule of Civil Procedure 55(b). See, Docket No. 52. Plaintiff requested entry of default judgment granting permanent injunction against Asociación Puertorriqueña de Fisioterapia, Inc. ("APF") because APF was already on default pursuant to a September 3, 2010-order (Docket No. 44) and liability could be established pursuant to the allegations of the Complaint and the unsworn declarations in record in support thereof.

As a result of TNPR's motion, this Honorable Court issued an order entering default against APF for a second time and referring the case to Magistrate Judge McGiverin "for a default remedy hearing and Report and Recommendation". Docket No. 53.

TNPR does not object to the case being referred to Magistrate Judge McGiverin for resolution. However, TNPR requests this Honorable Court or Magistrate Judge McGiverin to partially reconsider its order and enter default judgment granting permanent injunctive relief without a hearing. Because default was already entered against APF and the Complaint and its supporting declarations under penalty of perjury state a claim for injunctive relief under Section 1 of the Sherman Act, the Court can enter partial default judgment for permanent injunction without a hearing pursuant to Rule 55(b) of Federal Rules of Civil Procedure.

## II. Discussion

Under Federal Rule of Civil Procedure 55(b) a party must apply to the Court for a default judgment in cases where default has been entered against the defendant, but the amount of damages is not a sum certain. Rule 55(b) also states that the Court may conduct hearings when, to enter judgment, the Court needs to determine the amount of damages. Fed.R.Civ.P. 55(b)(2)(B).

In this case, the Court has entered default twice against APF. Dockets No. 44 and 53. Because of APF's default entry, this "constitutes an admission of all facts well-pleaded in the complaint." See, Bebe Studio, Inc. v. Zakkos, 2009 WL 5215374 (D.P.R.2009) (not reported in F.Supp.2d), citing, Metropolitan Life Ins. Co. v. Colón Rivera, 204 F.Supp.2d 273, 274-75 (D.P.R.2002); see also Banco Bilbao

Vizcaya Argentaria v. Family Restaurants, Inc., 285 F.3d 111, 114 (1st Cir.2002); Franco v. Selective Ins. Co., 184 F.3d 4, 9 n. 3 (1st Cir.1999). Therefore, if the allegations in the Complaint establish a cause of action under Section 1 of the Sherman Act, injunctive relief should be granted without a hearing, since a hearing is only needed in cases where the Complaint fails to state a cause of action or unliquidated damages are at stake. See, Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2688. See, Bebe Studio, Inc. *supra*; DirecTV, Inc. v. Hoa Huynh, 503 F.3rd 847 (9$^{th}$Cir.2007) (In reviewing a default judgment, the court of appeals takes the well pleaded factual allegations of the complaint as true; however defendant, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.)

    A.   P*er se* rule for horizontal agreements between competitors of section 1 of the Sherman Act.

There are two prerequisites for a successful section 1 claim. First, there must be concerted action. Second, the actors' agreement must involve either restrictions that are *per se* illegal or restraints of trade that fail scrutiny under the rule of reason. Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11 (1st Cir. 2004).

A p*er se* violation is that which has been consistently found to have a "pernicious effect on competition" and "would always or almost always tend to restrict competition and decrease output." See, Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58 (1977); Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20 (1979). Thus, when a *per se* rule is applied, a violation is found merely by proving that the conduct occurred and that it fell within a *per se* category. See, ABA Section of Antitrust Law, *Antitrust Law Developments* (6th Ed.2007)

3

at page 49; Broadcast Music, Inc. v. CBS, 441 U.S. at 19-20 (1979). Hence, when plaintiff proves conduct that falls within a *per se* violation, nothing more is needed for liability; the defendants' power, illicit purpose and anticompetitive effect are all said to be irrelevant. Addamax Corp. v. Open Software Foundation, Inc., 152 F.3d 48 (1st Cir. 1998); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

Admittedly, courts have been careful to confine *per se* treatment to conduct that is almost always anticompetitive and has no redeeming benefits worthy of being weighed against the negative effects. Addamax Corp., *supra*. Such conduct include includes horizontal price-fixing, bid-rigging and horizontal market allocation between competitors. See, *Antitrust Law Developments* at page 55. For group boycotts, (when two or more competitors refuse to conduct business with a firm) the *per se* rule usually is limited to horizontal agreements among direct competitors or when its sufficiently related to efforts to raise prices, restrict output, or divide territories. *Antitrust Law Developments* at pages 55-56.

FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) is the leading case on *per se* illegal horizontal agreements between competitors. Here, the Supreme Court upheld an injunction against a group of court-appointed lawyers that enjoined their concerted refusal to accept further case assignments pending a requested fee increase. The Court explained that "the undenied objective of [the] boycott was an economic advantage for those who agreed to participate," *Id*. at 426, 110 S.Ct. 768, and that the lawyers' joint activity was aimed at "profit[ing] financially from

4

a lessening of competition in the boycotted market". The determinative factor was that the boycott directly affected the marketplace by, *inter alia*, constricting the supply of lawyers available to represent indigent criminal defendants. The Supreme Court consequently held that because this concerted action was designed to impose higher prices it was "not only a boycott but also a horizontal price fixing arrangement –**a type of conspiracy that has been consistently analyzed as a *per se* violation for many decades**." *Id*. 493 U.S. at 436. (emphasis added) *See* also, Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (upholding an antitrust injunction that prohibited a professional society "from adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical").

With FTC v. Superior Court Trial Lawyers Ass'n, the Supreme Court ended the debate as to which group boycotts are *per se* violations and which ones were not. If the group boycott is among horizontal competitors and designed to affect price, these boycotts are *per se* unlawful without regard to market power of the participants. See, *Antitrust Law Developments* at pages 55-56, and 111. Hence, many courts use the term "classic boycott" to describe the types of refusals to deal to which the *per se* rules applies and are similar to FTC v. Superior Court Trial Lawyers Ass'n. See, e.g., United States v. A. Lanoy Alston, D.M.C., 974 F.2d 1206 (9th Cir.1992) (Circuit Court reversed District Court's acquittal of guilty verdicts rendered by the jury which concluded that three (3) dentists were guilty of a criminal antitrust offense for meeting with other dentists and convincing them to sign a petition requesting higher fees from an insurance company.)

5

and Sandy River Nursing Care Ctr. v. Aetna Cas., 985 F.2d 1138, 1143 (1st Cir. 1993) (concerted efforts by defendant insurance companies to refuse to offer certain types of insurance coverage in attempt to induce Maine legislature to authorize rate increases termed an economic boycott that beyond doubt 'constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act'")(quoting Superior Court Trial Lawyers Ass'n, 493 U.S. at 422).

Pursuant to these precedents, the allegations made in TNPR's Complaint under penalty of perjury alone establishes that APF members' collective refusal to deal with TNPR is *per se* illegal for being a horizontal agreement to fix prices and a 'classic' group boycott designed to affect price pursuant to Section 1 of The Sherman Act, 15 U.S.C. § 1 and The Puerto Rican Antitrust Act, 10 L.P.R.A §§ 257 et seq. As the lawyers did in FTC v. Superior Court Trial Lawyers Ass'n, the outpatient therapists' agreement not to enter into contract with TNPR that was described in the Complaint was meant to directly affect the marketplace by constricting the supply of therapy service providers available to MMM members in hope to gain a higher price for their services.

Moreover, the declarations under penalty of perjury made in TNPR's unopposed July 1, 2010's Response to Motion to Show Cause (Docket No. 32), all of which are incorporated herein, confirm the *per se* violation alleged in the Complaint.

As stated in TNPR's Complaint and its Response Motion to Show Cause (Docket No. 32), there is already direct evidence that competitors in the therapy market, through APF, agreed not to enter into contract with TNPR to obtain economic benefit. APF's President

6

and co-defendant, Regina Rivera confirmed this illegal agreement in her April 22, 2010-letter included in the Complaint as **Exhibit A** where Mr. Rivera stated: "**[t]he Private Section of APF has decided not to play MMM's game, none will accept your denigrating offer**…."

APF never appeared in this case and thus, never refuted the aforementioned evidence. Nonetheless, this letter specifically states that "APF" "**decided** not to play MMM's game" and that "none [of its members] will accept your denigrating offer." Clearly, this statement necessarily means that: 1) there was a meeting between competitors through APF (which, without explanation, is an inference of illegal coordination; see Response Motion to Show Cause at page 10[1]); 2) a

---

[1] Inferences can be drawn in favor or against defendants in cases alleging horizontal agreements, depending on the nature of the evidence and the plausibility of their allegations/defenses. In cases where **competitors had meetings between them and fail to explain what transpired during these meetings, one can, and should infer illegal coordination**, because meetings between competitors are a great danger to competition. Antitrust experts and professors, Phillip E. Areeda and Herbert Hovenkamp propose such a policy in their treatise by stating:

> Because contacts among competitors present a definite **danger to competition, it is reasonable as a policy matter to require the companies that are meeting to explain their actions**. **When an innocent explanation is not forthcoming or is not plausible, the suspicion arises that the contact was made in furtherance of a conspiracy to suppress competition**.
>
> . . .
>
> Although completely mute defendants are rare, silence may suggest that there is much to hide. But as a matter of fact divorced from antitrust policy, we are not logically entitled to infer from silence that any and every conspiracy that anyone may allege is thereby proved. But the policy that competitors ought not to get together without a legitimate reason requires some implementing sanction. **As a matter of law, therefore, the alleged conspiracy should be held proved by a significant assemblage consistent with it as to which no testimony is offered**. Observe that such a policy generates no jury question, for the conspiracy conclusion rest on a factual inference but on a rule of law.

Areeda & Hovenkamp, *VI Antitrust Law*, ¶1417c, page 109 (emphasis added).

7

decision was reached by competitors through APF; and 3) APF's decision was for its members not to enter into contract with MMM/TNPR.

Moreover, as shown in the declarations under penalty of perjury included in TNPR's Response Motion to Show Cause (Docket No. 32), there is plenty additional evidence that points to the existence and success of an illegal group boycott. First, TNPR made a *prima facie* reasonable fee offer to the therapists (same economic terms as in Miami-Dade County plus, the ability to charge co-payments). Therapy providers in Puerto Rico would be paid an average 17% more than Miami-Dade therapists. Notwithstanding said offer, TNPR received an organized coalition against the proposed contract and had to raise prices to meet this boycott, showing first hand the danger to competition that horizontal agreements like these are and the reason they are considered *per se* illegal.

These declarations under penalty of perjury also described how the therapists' statements in group meetings (Mayaguez and Manatí) and in TNPR's individual meetings with APF members showed concerted opposition against TNPR's offer by APF: 1) many therapist who had been MMM providers refused to even listen to TNPR's presentations on its offer; 2) therapists who expressed interest in contracting with TNPR, told TNPR they were hesitant about contracting with TNPR because they were receiving communications from APF urging them not to contract with TNPR; 3) therapists told TNPR that they had gone to APF meetings and were told not to enter into contract with TNPR; 4) therapists told TNPR that APF was collecting money to hire an attorney to file a Complaint against TNPR on behalf of all members; 5) therapists told

8

TNPR and MMM that they would not sign with TNPR until APF authorize them or because they were loyal to the therapists' cause.

Thus, Plaintiff has met its burden in stating a *per se* violation of section 1 of the Sherman Act in its Complaint and in its unsworn declarations under penalty of perjury which further detail APF's boycott activities. The allegations of the Complaint and unsworn declarations show that APF coordinated and put into effect an illegal horizontal agreement between therapists-competitors to attain higher fees for their services.

Hence, in order to redress the continued effects of this boycott and send a clear message to APF that these types of agreements are illegal and will not be tolerated, TNPR requests this Court to issue permanent injunction.

**WHEREFORE**, TNPR hereby requests this Honorable Court to enter partial judgment and permanent injunction against APF ordering it to: issue a public statement recanting in its entirety its April 21, 2010 position-statement and holding that APF does not, nor cannot have a position in connection with TNPR's contractual offer; refrain from contacting any therapists by phone, text or any other mean to influence in any way the therapists' decision with regards to TNPR's offer and notify TNPR or this Court of anyone that continues to do so; and hold any prior communications by APF, urging them not to enter into contract with TNPR as illegal, and warning that any future communications for these purposes will be held in contempt of the Court and result in monetary sanctions.

WE HEREBY CERTIFY that on this date a true and exact copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to: Marcos

9

Valls-Sanchez, Esq. at valls@prlegalsolutions.com and Maricarmen Almodovar-Diaz, Esq. at fayse@prtc.net

In San Juan, Puerto Rico, this March 10, 2011.

S/ HERMAN G. COLBERG-GUERRA
Herman G. Colberg-Guerra
USDC Bar No. 212511

**PIETRANTONI MÉNDEZ & ÁLVAREZ LLP**
Banco Popular Center 19th Floor
209 Muñoz Rivera Ave.
San Juan, Puerto Rico 00918
Telephone No. (787) 274-1212
Facsimile No. (787) 274-1470
hcolberg@pmalaw.com

10